310-0212, and we're here to about a Stewart appellate at record black versus Robert Henry Stewart appellate by Stephanie Speakman. Ms. Speakman, you may proceed. May it please the court, Justice Holder, Justice Linton, Justice Cranford, and Justice DeVos. My name is Stephanie Speakman, S-P-E-A-K-M-A-N, and I represent the appellant in this matter, Robert Stewart. As the court is obviously aware from the briefs, this is a matter that concerns the custody modification of three minor children. For, I think, ease of explanation and discussion, I'm going to lay out the players by first name. The folks involved here are Donna Marie Stewart, now known as Donna Marie Pilkington. Donna and Robert were previously married. I'm going to refer to them, the mother of the children involved here is Donna. The father is Robert. Donna, since the divorce was entered, has remarried. Her husband's name is James. But throughout the record, you'll see him referred to as Bo, so that's how I'll refer to him today. And Mr. Stewart has also remarried, and his wife's name is Stacy. So again, for ease of reference, I will be referring to them as Robert and Stacy, Donna and Bo. This case arises following a custody hearing that was heard in the 12th Circuit from the Honorable Judge Robert Barrett. Judge Barrett entered a written order. Just so that the court is clear, there was no oral order given. He set the matter over for presentation and did then just file the written order. So if you were to look through the record, you would find no additional explanation of the findings beyond what is contained in the decision. The decision, and that's where we're appealing here, as the court is well aware, the standard of review is whether or not the decision is manifestly erroneous and whether or not it causes a manifest injustice to the children involved. And in this case, it is the appellant's position that, in fact, that is precisely what the judge's decision has done. It is manifestly erroneous and has created a manifest injustice to the children. The decision itself finds that it basically tracks the statutory language of 602 in determining what's in the best interest of the children. And, of course, what we're talking about here is what's in the children's best interest. First, he notes in his decision, which is contained in the common law record at pages 279 and 280, it's also attached to the brief, that both parties wish to be the sole custodial parent. Here's the first instance where the record is not quite consistent with what Judge Barron says. In fact, although Donna filed a petition to modify joint custody to sole custody and ask to be residential custodian, Robert merely filed a petition to modify the currently existing joint custody arrangement and ask that the children reside with him. Now, a little background here. When the parties were divorced, they lived within a very few blocks of each other. And the initial custody determination was, in fact, basically a true 50-50 split between the parents with the children staying from 7.30 in the evening until 7.30 in the morning with their mother and from 7.30 in the morning until 7.30 in the evening with their father. That was based in part on the ages of the children. The youngest at the time of the divorce was preschool age, and Mr. Stewart, his work schedule provided that he could be home some during the day. Now, this was a joint parenting agreement entered into between the parties voluntarily? That's correct, Your Honor. And so it was entered into the judgment of divorce? That's correct, Your Honor. And there is therefore a joint parenting order and joint residential custody? That's correct. Okay. Within approximately six months of that order, some changes took place, and Robert and the children moved to the town of Essex. At that time, although the record is there is some disagreement based on the parties' testimony in the record as to when Donna found out about the move, Robert saying that he told her in advance and that he consulted with her, Donna saying she wasn't consulted with. The fact is that in 2007, the party, Mr. Robert and the children, his new wife, Stacy, and her three sons all moved from Plainfield to Essex. At this point, although the true shared custody was no longer actually occurring, there were no motions filed to modify the custody or residential parenting agreement at all. This continued to be the case with the children residing with Robert and Stacy, their three step-siblings, Stacy's children from a previous marriage, and then in 2008, a new child was added to the family. Robert and Stacy had a child. Well, what we have here are the parties modifying between themselves without going to court different visitation arrangements. Am I correct? That's correct, Your Honor. Okay. And this whole action began when Robert filed a motion for child support. That's correct, Your Honor. And then it was met with a motion for change of custody. That's correct, Your Honor. And then cross-petition. There was finally cross-petition, and so we had a hearing, and here we are today. Right. So perhaps the most disturbing and disconcerting factor in Judge Barron's decision is that if you read it without any reference to the record, without looking at the record at all, it never mentions that from 2006-2007 onward, the children physically resided the majority of the time in the home in Essex with Robert and Stacy. And that's one of the critical things that the appellants believe is problematic and shows a manifestly erroneous decision on the part of Judge Barron because he never mentions that these children lived with their father. What about the mention of the fact that he felt the mother was in a much better situation to facilitate a close and continuing relationship with both parents? And given the father's personality and given the past behavior, there was difficulty on the father's part in facilitating a relationship with the mother. I think that, in fact, that statement by Judge Barron is not borne out by the record. And I would point particularly, and I've noted this in the brief. Is it true that that's the only factor that Barron made his decision based on? I think based on the record, that is. Based on his decision, that's how it appears. So why is that an error? I believe that's an error because, in the first place, he doesn't consider the fact that the children did live with Robert. And there's a case, one of the cases that I cited, which is Hall v. Hall, I apologize, in which the court held that the failure to consider even a temporary long-term living arrangement with one parent or the other made the trial court's decision manifestly erroneous. This is in Hall v. Hall, which is, again, cited in the briefs, and is 226 LF 3D 686 589 NE 2nd 553, which is, in fact, a third district case from 1992. In that case, although the parents were never married in this particular case, that's not relevant for purposes of argument because the same standards apply whether the parents are married or not. But in Hall v. Hall, and it's named Hall v. Hall because it's the father versus the minor in an odd setting of the case title. In that case, the mother had the child. The father filed a paternity action. The minor resided with the mother. And for several years, the custody dispute went on, I believe the court notes, for two years, through numerous protracted hearings culminating with an oral ruling in which the judge gave custody to the father, despite the fact that for the entire time of the child's life, she had resided with her mother. And there the appellant, the mother, argued that the court failed to give adequate consideration to the factors, including adjustment to his home. And the court says very clearly, although Dad had maintained an abiding interest in the child, that wasn't enough to overcome the presumption of stability being in the child's best interest. Was the factor that the judge alleges occurs in this case with regard to not facilitating the relationship, did that factor appear in that case? That factor did not appear in that case. Thank you, Your Honor, because that allows me to backtrack to the other inconsistency. Let me ask you this. Is the trial court required to go down the list of factors one by one? They are not. Clearly, they're not required to. But obviously, in making a decision of this type, it's important to at least know from the decision that they considered all the relevant factors. And, again, based on the written decision, it does not appear that the factor of the children actually being in the physical custody of Robert was even considered as an issue. And I just want to backtrack to the issue of, you know, there are statements and there was testimony from Donna regarding these allegations that they couldn't get along. And yet, on page 419 of the record, after Donna has testified, after the Court of Court of Guardian Ad Litem has testified, after Dr. Pools has testified, Judge Barron says this. With regards to the issue involved in issue one, which for purposes of brevity, I'm focusing the issue, my oral arguments here, on the second issue that we brought up, which is the manifesto erroneous. Obviously, we still want the courts to consider the evidentiary issue that we brought up in issue one. But what the judge says between pages 414 and 419 is, he says, you know, I've got a simple case here in my mind. I've got a simple case, as far as I'm concerned, where everybody has been telling me from day one that I've got two terrific parents and three terrific kids. This is a pleasure for a judge because I worry about the case where I've got two lousy parents and I'm afraid to leave them with any of them. I can't make a mistake in this case. I just can't make a mistake. I've got two great parents and three great kids. Now, this is after all the testimony, except for Mr. Stewart's testimony and his wife's testimony and some other testimony for the appellant here. But after Donna has testified, the judge still says, I've got these great parents, I've got these great kids. The judge's statement that Donna simply is the better parent to facilitate communication is just not borne out by the record. How does that figure into that statement, figure into the other statement the judge made with regard to Dr. Poole's personality assessment, Mr. Stewart, that he had a narcissistic personality disorder and that coincided perfectly with the facts of the case? How does that factor into your analysis? Your Honor, to be perfectly honest, I have combed this record repeatedly. And Judge Barron doesn't specifically say, these are the things about Mr. Stewart that I say match up with Dr. Poole's statement, that match up with this personality disorder. I don't see it from the record. The appellant does not see it from the record. But the judge said that, though. The judge did say it. He clearly said it. And it's contained in Dr. Poole's report, this issue of a personality disorder. But even as to that, in his testimony, Dr. Poole talks about, you know, generally speaking, when people aren't getting along, it's because both parties aren't getting along. So even though there is some testimony in the record that perhaps there was friction, I don't think this idea that Don is in a much better position to facilitate a relationship than Robert is borne out by the record. Because the guardian ad litem and Dr. Poole's both said these children both love their parents both equally. And if what Judge Barron has said were to be true, you would expect that somewhere in the interviews that there would be some type of angst or anxiety against Mom. Because that's really the issue here. We're talking about kids. Well, Dr. Poole talked about the personality disorder, didn't he not? He did. What that means. You know, I think all of us probably have some personality disorder of some kind or another. Again, I don't, I cannot tell. I cannot see from the record, and Judge Barron did not make. Doesn't this all boil down? Simple. We have one factor that the judge pointed out that was deficient on the part of Robert, that allegedly would not be as deficient on the part of Robert's ex-wife, the mother of the children. And so, therefore, that tilts to change from joint custody to sole custody. I think that may be how he analyzed it. But I think the fact that Judge Barron failed to even give any weight or any consideration to the fact that these children had lived with Robert and to change where they were living, to change, yes, they can adapt anywhere they're at. I have a question. Is Robert seeking sole custody in this? Robert's original petition was just to modify the joint custody, not to seek sole custody, but to modify the joint custody to reflect the reality, which was that the children physically resided with him. That reality that he wanted to reflect would mean that the children spent how much time with the father and how much time with the mother? The children were all school-aged, so they would basically spend the week with their dad, every other weekend with mom, and then there was a middle-of-the-week visitation for mother. Which is what they agreed to in 2006 when they moved to Essex with the children, correct? There was a tacit agreement, although there was no legal agreement. Well, they never went to court until the child support issue raised its head. That's correct. Okay, a tacit agreement all the way through, correct? Yes. Okay, thank you. Mr. Black, you may respond. Yes, thank you very much. Good afternoon. May it please the Court? Yes. My name is Robert G. Black. I appear on behalf of the appellee, none other than Donald Pilkington, in this matter. We do note that the appellant did raise two issues, one being the exclusion of certain testimony, the second being whether the decision to modify custody was against the manifest way of the evidence. And obviously, during the oral argument, the brunt of the, or actually all of the discussion has been concerning that second issue. I will only state as to the first issue that we are dealing with an abusive discretion standard there, and we're talking about the exclusion of evidence, which is the most deferential standard to the trial court's determinations of all. But more to the point, that issue still has to be preserved. And to preserve it, we have to know what was excluded to determine if what was excluded was wrong and whether that was prejudicial. And we don't know what was excluded because no offer of proof was ever made.  I believe there does, Your Honor. There should be, Your Honor. Or should there just be something in the record to represent what that evidence would show if it were? Oh, yes. If you're asking if there should be a formal offer of proof as opposed to counsel's discussion of what the testimony would be, I would concur that counsel could set forth what the testimony could be. Did counsel in this instance do so? I don't believe so, Your Honor. Not against these children, but against minor children. What does that mean? Counsel was asked pointedly if the testimony of Bo's ex-wife, Mia, concerning prior incidents in the Kane County matter of purported violence involving in orders of protection with Bo and his ex-wife and with his son, had anything to do with the children in this matter. And counsel responded, no, it did not. But against minor children. I don't believe... I'm just quoting from the transcript. All right. Now, wouldn't that be fairly pointed? And would not a trial court be interested in such when making a decision as to where minor children will be placed? Your Honor, I, again, respectfully, would answer the question by, again, going to the offer of proof issue, but also as I read Section 602A6 and A7 in terms of the person having custody of the child, whether that there were some issues of violence by the person who could have custody of the child towards that child, and in Section 602A7 having to do with an occurrence of ongoing and repeated abuse, as defined under Section 103 of the Domestic Violence Act. We don't have any aspect of that here, even if we were to take this as an offer of proof that this doesn't have anything to do with these children. I believe that in terms of, at that time, those children, one was a minor and one was not. We also did have the evidence concerning Robert's treatment of his former stepdaughter, who is Donna's daughter from a previous marriage, which the Court did comment upon and did say that it found that it would be highly unlikely that this would recur in either person. As to the issue of whether the decision to modify was against the manifest way of the evidence… But you agree that would be important, I mean, to have evidence that in making a decision that if they're a parent, their degree of violence against minor children, if any, that that evidence would be rather important. It would be of some significance. Some? Yes, Your Honor. It would be of some significance, Your Honor. Also, based upon what happened here, the judge did talk about that this was merely cumulative of what he had already heard before, in addition to the fact that this did not involve something of more recent or more direct circumstances and not involving these three minor children that are the subject of a custody dispute. But he did hear evidence against Robert. Yes, he did. He heard evidence, Your Honor, against Robert and he heard evidence against both. He only heard evidence against an adult shot against both. That is correct. He didn't hear anything about children. No, he did not. But he did against Robert. That is correct. I see where… Okay. Yes, that is significant, Your Honor. Okay. All right. Going back to the manifest way to the evidence component of this in terms of the decision to modify custody, and I'm going to apologize to you, Your Honor, because I had a brief lapse of memory as to who was a minor and who was not a minor if you're with Bo vis-à-vis Robert. So my apologies to the court there for my lapse of memory there. That's okay. In terms of the manifest way, we start with the one very simple premise here, that a custody determination by a trial court is entitled to great deference because the trial judge is in the superior position to observe the parties, observe their credibility, and determine truly what is in the best interest of the children. We have had decisions, we've cited the decisions, and this case turns upon this, that where one parent does not facilitate that close and continuing relationship between the children and the other parent, then that is grounds to modify custody, change custody, alter custody, have what happened here. Obviously, these custody cases, in large part, can be fact-driven. This one is fact-driven. As Your Honor has noted, there was an initial joint custody arrangement by the agreement of the parties where it started off with, for shorthand reference, Dad has the children 8 to 6 p.m. two days a week. During the week, Mom has them 8 a.m. to 6 p.m. Dad had them because he was working at night. Mom had them 8 p.m. to 6 a.m. She worked during the day. They alternated weekends. Well, are you saying then, because these parties did not avail themselves of court determinations until, I think correctly, money came into the picture, child support. Yes. But there was a tacit agreement of a residential relationship during the week, every other weekend, one night a week, visitation, if you will. And that went on for about two years. They did come to agreements between themselves that were never reduced to writing, never came back into court, and they cooperated for two years until the issue went to the payment of support, the fact that the youngest child had reached first grade, and the marital settlement agreement and judgment of dissolution said once this youngest child reaches first grade, that Donna's obligation to pay the $500 per month for daycare, et cetera, to Robert would halt. It's at that point where everything starts to go haywire. Yeah, Robert brings the child support. Right. Robert not only brings the support action, but Robert acted to restrict the visitation, to make it more difficult for Donna to have the visitation, and to do all the other things that are apparent of record here that show how, in the court's words, it was either my way or the highway with Robert, and that this was in line with Dr. Pohl's assessment here. Because we had a situation where, in terms of how the visitation played out, it went from that situation to, okay, they moved to Essex, and the babysitter was driving them back and forth, and then the babysitter quit with notice to Robert, without notice to Donna. Donna said, you know, we'd like to continue this. Would you be able to meet me halfway? Nope. Robert says, not going to do it. From that point, she did lose her job. She did have to move in with a friend, and it made it more difficult for her. But Robert then says, okay, the only time you're going to get your alternating weekends, but you're only going to have one night a week for dinner down here in Essex, and you've got to do all the driving. Again, never reduced to record, never reduced to an order there. We had situations where, for a while, Donna had the children Friday afternoon after school until Saturday afternoon, overnight until Saturday afternoon, because Robert was working, and then Robert took that away again. Robert wanted to exercise his visitation with the children in terms of his vacation time over the subsequent weekends that Donna was going to have visitation, thereby removing her visitation. We also have, and I am personally, I personally find this somewhat more egregious from the record, is the issue of the telephone calls. By way of the joint settlement agreement and the judgment of dissolution, telephone calls were to be encouraged. Communication between the children and the parents was supposed to be encouraged. There was a litany of instances where mom tries to make phone calls to the children, and Robert and Stacy, father and new wife, testify, admit that, well, we weren't going to allow the kids to, we saw that it was Donna, the mom, calling, and we weren't going to allow that contact because it was dinner time, homework time. I don't think you can unilaterally restrict like that, that type of visitation that you've over, I'm sorry, contact that you've already agreed upon by way of these telephone calls. We have instance after instance where instead of contacting Donna as would be her right in terms of the right of first refusal, if, to look after the children, to be with the children, that's not followed. And the most extreme instance being the instance in December of 2009 where Robert and Stacy left for a trip for Florida for four days, didn't tell the children, left the six children, Stacy's three, Robert and Donna's three, and then a seventh one, their child together, and an elderly mother of Stacy, with either a 19 or 20-year-old babysitter, the record is not precise, who had her own one-year-old child there, and her 21 or 22-year-old boyfriend, and the nine-year-old step-cousin, I guess is what it was. And they took off like that, didn't tell Donna, didn't give her the opportunity, police were called, a wellness check was performed, and then Robert refused to release the children to Donna. The initial child custody situation where they wanted to be 15% and they wanted to have joint residential and joint everything, and how they set up the vacation was based upon the fact that at that time Robert was working at night, Donna was working during the day, and therefore the easiest thing for them to do is to switch off like that, so that Donna had the children after her work was done, Robert had the children after his work overnight was done. We have in the record here that as of 2009 Donna took a job at a bank where she could work from home. She was available, accessible to the children at all times, and yet what happened here is the school records show in here that Donna was not even listed as the mother, Donna was listed as second, third emergency contact, Donna was not advised of school activities, and then we go back to the fact that the children's medical care, the father, Robert, and Stacy, admitted during the hearing in this matter that well, once money became an issue, Donna wasn't paying the $500 a month anymore, we filed the petition for child support, we were going to take the kids to the doctors whenever we wanted, wherever we wanted, and understandably they're in Essex and we want that closest in terms of the physicians, that's fine, but we're not going to tell mom about that. We have all these factors of record that are building up and building up and building up, which allow the court to make its very, what I believe is a very reasoned and well thought out decision here, where it basically takes all the factors under section 602 and it concludes that Donna, Mrs. Billington, is far more willing and able to facilitate and encourage a continuing relationship between children and the other parent, whereas Mr. Pilkington is not. And the court heard the evidence from Dr. Pools concerning the narcissistic personality disorder, the fact that he was, I think in Dr. Pools' words, controlling, and the court took that and extrapolated that from the record and he said, okay, this is the factor that I deem most significant here. And it totally, what I heard in court, what I observed in court, what I saw from the demeanor of the witnesses and from the evidence of record, completely tracks what Dr. Pools told us. And in the court's words, Robert's philosophy here was my way or the highway. Okay, we'd agreed at some times that I'm going to restrict it here, I'm going to restrict it here, I'm not going to allow you to do this, I'm not going to allow you to do that. How would you respond to Ms. Speakman's argument that the trial judge paid no attention to the factor that the children had been primarily residing with the father for a couple of years? I would respectfully disagree with that, certainly, Your Honor, because I think within the judge's findings, and I have a record here on page C-279, under paragraph 2, subheading C, D, E, and F, that the children have equal and excellent relationships, that they have equal comfort level in each. I think the court very carefully considered what has been going on here and considered their comfort levels, considered specifically that the school districts are equal in stature academically, but mom's location is much closer to the school that the girls would be attending there, whereas it's a bus drive in Essex, and that the mother is more accessible now, more flexible now, because she works from home. We have the significant changes here in the situation because of the loss of communication, which the court found expressly, and because of the change in location, and I'm going to look at all of these factors one by one and say, okay, I have considered that the children have not really expressed a preference here. I'm going to consider that... Was there any in camera? No, Your Honor. At least, no, the record does not reflect that. Counselor, tell us that. Your Honor, we would then, if there's anything else, we would respectfully request that the judgment and decision of the circuit court be affirmed. Thank you. Ms. Speakman, you may reply. Thank you, Your Honor. Very briefly, just a few things that I want to point out from the record. One, it is true that the record did indicate that Donna, in approximately 2009, began working from home, but one of the things that counsel did point out that she also testified to was that she had moved no less than three times during the time that the children had resided in Essex with Robert, and that at no time, subject to cross-examination, she testified that at no time, even when she was unemployed or able to work from home and her husband was unemployed, did she consider moving closer to her children. Her children lived somewhere. She didn't take that into account. She could work from home and her husband wasn't even working, and yet she didn't consider moving closer to where the children were in Essex. As to the points that counsel just brought out, numbers 2C in the judge's decision on page 279 of the common law record, the children have equal and excellent relationship with each of their parents, siblings, step-parents, step-brothers, and sisters, and all of their persons. That's not true in the record. Donna testified that she had never even met Beau's children from his first marriage. These children that the court asked about with regard to Mia Pilkington and the testimony regarding potential abuse of minor children that wasn't allowed. Donna had never even met these children. So for the judge to say that there are equal and excellent relationships between step-siblings they hadn't even met and step-siblings that they lived with every day, that step-siblings that the principal of the school, down at the Braidwood School, came in and testified about the close nature of these six school-age children, three of Stacey's children, Robert's three children who were the subject to this case. That's just not correct based on the record. Equal comfort in each parent's home. Well, that again goes to this issue of potential parental alienation, which is what we're talking about with Robert's inability to communicate with Donna. And I just want to point out that in a couple of the cases that counsel cites in the marriage of Ricketts, which is a case where there was a termination of a joint custody arrangement and a sole custody grant to a father that was affirmed. In that case, there was substantial evidence that the mother was doing everything humanly possible to destroy the relationship between the father and the child. And that in at least one of the other cases where a change in custody was affirmed by the appellate court, again, it's a parental alienation case, where in the other case, and the name escapes me as a case cited by counsel, Dr. Shapiro, a court-appointed doctor, testified regarding a problem with parental alienation that the mother was doing, trying to prevent the child from having a positive relationship with the father. That's not the case here. There is no issue of parental alienation. There is no issue that Robert's not nurturing a positive relationship with Donna. What about the evidence the opposing counsel is pointing to about emergency contact, notification of doctor's visits, those types of things, not permitting children to answer the phone if it's knowing that it's their mother? That seems to be the pivotal term here in this whole case. Well, as to the not answering the phone, I think we can shift that. There's another way to look at that, which is why is Donna calling during dinner and homework times? And the fact that Robert and Stacey want defined dinner and homework times, I don't believe that counsel, I think the record is clear. But where that goes to, I think, is from the trial court's perspective, is that taps into this controlling personality, I'm going to control, which is antithetical to a joint parenting agreement by its very essence, I think, is what the court is finding fault with here. And I think you can think that's true, except that, again, we have a history where these children have had a positive nurturing relationship with their mother, and they're living with their father. So, and I don't think that, I think when you review the record, you'll also see that it wasn't that Robert and Stacey did not allow the children to contact their mother at all. It was simply during specific times of the dinner hour and when they were involved in homework, but that there was lots of communication. Well, should that be in a joint parenting agreement, a unilateral decision by one parent, or should that not be a decision that should be jointly arrived at? And the decision as to when to call children is as much a parental prerogative by one parent as opposed to the other. And I think, phrasing it, looking at it that way, I think what we had was competing parental prerogatives. She chose to call during dinner, and he chose not to let them answer the phone. I don't think that shows any type of alienation of the parents. And again, they did have, they did encourage the children to call at other times. So I don't, I do not believe that, and then counsel talks of this one instance with the babysitter. Again, that's one instance over the course of a number of years. The fact that Robert chose to more strictly comply with the terms of the joint parenting agreement and the dissolution subsequent to Donna filing for change in custody after he's been taking care of these children the majority of the time for four years, although perhaps ill-advised, again, is not necessarily showing that he's just a controlling person. Thank you, counsel, for your arguments in this matter this afternoon. It will be taken under advisement, and a written disposition shall issue. The court will stand in brief recess for panel change.